```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
NIAMEASHA L. N. SMITH o/b/o CRS,                            :      MEMORANDUM DECISION
                                                            :      AND ORDER
                                Plaintiff,                  :
                                                            :      20-cv-00533 (BMC)
                - against -                                 :
                                                            :
COMMISSIONER OF SOCIAL SECURITY,                            :
                                                            :
                                Defendant.                  :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

1. Plaintiff's mother, on behalf of her 4-year-old (at the time of his hearing) son CRS,[1] seeks review of the decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that CRS is not disabled as defined by the Social Security Act for the purpose of receiving disability insurance benefits.

2. One way that a child can qualify for disability benefits is for the child to have "marked" limitations in at least two of the six domains listed in 20 C.F.R. § 416.926a(b)(1)(i-vi). That is considered the functional equivalent of a "listed" impairment. Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012). Here, the ALJ found that CRS has marked limitations in the domain of moving about and manipulating objects. There is far more than substantial evidence for that finding – CRS has been diagnosed with dyspraxia which manifests itself in awkward moving and sitting, balance problems and falling, dropping or inability to grasp items, as well as garbled speech formulation (although his speech impairment is not directly related to this particular domain).

---

[1] Some of the evaluation reports quoted in this decision refer to CRS by his first name. Since this decision will be publicly available, I have changed those references to CRS.

3. Plaintiff contends, however, that plaintiff also has marked limitations in another domain – caring for himself. As to that domain, the ALJ found that plaintiff has only "moderate" limitations. The issue in this case is therefore whether substantial evidence in the record supports the ALJ's conclusion that CRS has only a moderate, not a marked, limitation in caring for himself.[2]

4. According to SSR 09-7p, the domain of "caring for yourself" assesses how well the child "maintain[s] a healthy emotional and physical state in ways that are age-appropriate." 20 C.F.R. § 416.926a(k). The regulations make some distinctions as to what is expected from children 1–3 years old and 4–6 years old, with increased expectations (not surprisingly) for the older group. CRS was in the younger group when his mother filed his application but in the older group by the time of his hearing.

5. For a 2 ½ year old toddler like CRS was at the time his application was filed, caring for himself means the child

> should be trying to do more things for yourself that increase your sense of independence and competence in your environment. You might console yourself by carrying a favorite blanket with you everywhere. You should be learning to cooperate with your caregivers when they take care of your physical needs, but you should also want to show what you can do; e.g., pointing to the bathroom, pulling off your coat. You should be experimenting with your independence by showing some degree of contrariness (e.g., "No! No!") and identity (e.g., hoarding your toys).

20 C.F.R. § 416.926a(k)(2)(ii). For the 3–6 age group (referred to as "preschool children"), caring for himself means the child

---

[2] Plaintiff's motion raised as an issue whether the ALJ also erred by not finding that plaintiff met Listing 111.09, a communication impairment stemming from neurological disorder. However, although the Commissioner disputed that claim, plaintiff did not reference it in her reply brief. It is therefore deemed abandoned. See Lipton v. Cty. of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

> should want to take care of many of your physical needs by yourself (e.g., putting on your shoes, getting a snack), and also want to try doing some things that you cannot do fully (e.g., tying your shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for you to agree to do what your caregiver asks. Later, that may be difficult for you because you want to do things your way or not at all. These changes usually mean that you are more confident about your ideas and what you are able to do. You should also begin to understand how to control behaviors that are not good for you (e.g., crossing the street without an adult).

20 C.F.R. § 416.926a(k)(2)(iii).

6. CRS was born on May 24, 2014, and plaintiff filed the application for disability on his behalf on November 17, 2016, claiming an onset date of birth. The hearing before the ALJ was held on July 19, 2018, and the ALJ denied the application on December 6, 2018.

7. The ALJ found only a modified limitation on CRS's ability to care for himself, reasoning as follows:

> Claimant's mother reported that the claimant was unable to tolerate taking baths, having his teeth brushed, and having lotion rubbed on his skin. However, recent evaluation indicated that claimant did not have significant deficits in sensory integration skills. The claimant's mother stated that the claimant still used pull-ups, but the pediatrician did not identify this as an issue, as children learn at their own pace. She also testified that she assisted the claimant with dressing. I have assessed a less than marked limitation to account for the issues identified by claimant's mother.

(Citations omitted). However, there was a lot left unsaid there.

8. I have three observations about this finding. First, a deficit in sensory integration skills *may* explain or contribute to a deficit in administering self-care, but it does not have to. The child can be quite aware of and able to process external stimuli – for example, the child may not have an excessive sensitivity to noise – but that does not mean he can care for himself. Using sensory integration as the exclusive proxy for self-care skills can be misplaced.

9. Second, the ALJ's reliance on the hearsay statement of an unnamed pediatrician to CRS's mother to minimize the significance of lack of toilet training was given undeserved

3

importance. What CRS's mother actually testified was that, "I've been trying to potty train him but it seems[] like[] he's just not getting there. … I've spoken to his teachers … they said that children learn on their own time." When the ALJ followed up by asking if plaintiff had discussed it with "the pediatrician," she testified that she had, and that he had also said, like CRS's unnamed teachers, "children learn on their own time."

10. Of course, hearsay is admissible in disability hearings. See Gullo v. Califano, 609 F.2d 649, 650 (2d Cir. 1979). But the rather vague statements relayed to the ALJ by CRS's mother have limited probative value. There was no time frame given for these statements, nor did the ALJ inquire to obtain one. The statements may well have been made in 2016 when CRS was less than three years old or even earlier. It's bad enough if a child that age is not toilet trained, but by the time of the hearing when plaintiff's mother testified, CRS was nearly 4 ½ years old, and still not toilet trained.

11. Although the ALJ did not qualitatively differentiate between the various activities involved in a 4 ½ old's ability to care for himself, the lack of toilet training at that age is a rather significant impairment. It can obviously affect other developmental milestones, like socialization, education, and acquisition of self-image. This is confirmed by the fact that the regulations expressly identify toileting as one of the milestones used to measure the severity of a developmental impairment. 20 C.F.R. § 416.926a(k)(1)(ii).

12. The regulations do not provide that the lack of toilet training, even in a 4 ½ year old, constitutes a listed impairment or the functional equivalent of a listed impairment. But that was far from the only self-care deficiency that CRS had. The deficiency in his fine motor skills supported his mother's testimony (and the ALJ never questioned her credibility) that he could not feed or dress himself, or brush his teeth. Most of his 2016 testing confirmed that his adaptive

behavior, which seems closest to the domain of caring for himself, was very poor – he could not show what foods he liked or disliked, pull off his own socks, use a straw to drink or drink from an open cup held by an adult, and could not help with simple household tasks, nor tolerate having his face washed or bathing. The 2016 testing for adaptive skills was 2.20 standard deviations from the mean for his age. That is significant because 20 C.F.R. § 416.926a(e)(2) provides that if a child has "a valid score that is two standard deviations or more below the mean," that is considered a "marked" deviation.

        13.       Third, there is significant additional evidence in the record that there is, in fact, a lack of sensory integration – and, particularly, the kind of sensory deprivation that would cause a deficit in the ability to engage in self-care. In a June 22, 2016 occupational therapy evaluation (on which the ALJ and the Commissioner rely for other purposes) (the "Banks evaluation"), there are extensive findings of a sensory processing impairment. Only by way of example, in her summary, the evaluator noted:

> [CRS] exhibited the following Sensory Processing concerns:
> - Difficulty processing Auditory information.
>   - o Does not consistently respond to his name when it is called.
> - Difficulty processing Tactile information.
>   - o Unable to tolerate the sensation of having his face washed.
>   - o Difficulty tolerating having his teeth brushed.
>   - o Difficulty tolerating having lotion rubbed on his skin.
>   - o Difficulty tolerating taking baths.
> - Difficulty processing Proprioceptive information.
>   - o Walks on tip toes to negotiate the environment.
>   - o Bumps into things without noticing them in the way.
> - Difficulty processing Oral information.
>   - o Immaturely mouths objects as a way to explore his environment.
>   - o Sometimes chokes when drinking.

> o Loses fluid from his lips when drinking.

14. From this report, the Commissioner extracts one further statement towards the conclusion of this lengthy report to support his argument: "However, this does not appear to impact his ability to attain age appropriate fine motor or adaptive skills at this time." As suggested above, the fact that CRS's sensory integration impairments may not be the cause of his limited ability to engage in self-care does not equate to only a moderate inability to engage in self-care. In fact, this reference to "adaptive skills" in the summary of the Banks report is the only appearance of the word "adaptive skills" in the entire report. Far more significant is what precedes the statement on which the Commissioner relies, before the word, "However":

> This information suggests that [CRS] does not register certain types of sensory information more than other children his age (i.e. does not respond to his name). He is also sensitive to other types of sensory information; therefore, he avoids the sensations (i.e. grooming tasks). Children with these types of sensory processing difficulties can have problems relating to their environment because they tend to appear uninterested and unwilling to participate in daily activities. This also manifests as poor body awareness (i.e. bumping into things, walking on tip toes, etc.). Since they don't have a good feel for where their body parts end and objects around them begin, they tend to have poor motor control and poor motor planning.

15. The Commissioner responds that the ALJ properly relied on an occupational therapy evaluation on February 25, 2018, made when CRS was 3 years, 8 months old (the "Galperin evaluation"). That evaluation, as cited by the ALJ, found that CRS had "no deficits in sensory integration skills." Again, I do not see why this is an absolute refutation of the lack of ability to engage in self-care; it strikes me as an apples to oranges, or at least oranges to

6

tangerines, comparison.[3]  Much more relevant is the same evaluator's conclusion at the same time, appearing in the immediately preceding paragraph, as to CRS's self-care skills:

> **Self-help:** [CRS]'s self-help skills are delayed based on DAYC-2 [Developmental Assessment of Young Children] standardized test. Based on the assessment and parent interview, [CRS] removes loose clothes but he cannot dress self independently with simple clothes. He wakes up during the night. He is not fully toilet trained. [CRS] cannot groom self independently. He cannot pour milk into the cup. He helps with simple household tasks. He does not clean up his spills. [CRS] feeds self with eating utensils with hand help. [CRS] cannot button or unbutton buttons.

16.     This is not to say that there is *no* evidence supporting the ALJ's conclusion.  For example, the Commissioner relies on an earlier evaluation (April 5, 2016) in which the DAYC-2 test was also administered (the "Zapata evaluation"), noting that, other than gross motor skills, the evaluation was essentially normal, including a 98 ("average") rating in adaptive skills.  Notably, however, there is no questioning or report in the evaluation findings about CRS's ability to engage in basic tasks of self-care.  It seems clear that the focus of the evaluator was elsewhere when it came to adaptive skills.

17.     Moreover, two months later, on June 15, 2016, another evaluator (the "Almonte evaluation"), again administered the DAYC-2 test.  The evaluator summarized the "Adaptive" portion of the test as "measur[ing] independent, self-help functioning; skills include toileting, feeding, dressing and taking personal responsibility" – which seem a more relevant analogue for the ability to engage in self-care domain with which we are concerned here.  The evaluator's

---

[3] The evaluator defined "sensory-integration skills" as "the brain's ability to register, filter, interpret and retrieve information accurately."  She used a "checklist" to assess these skills; they are apparently not directly addressed by the Developmental Assessment of Young Children ("DAYC-2") standardized test, which she administered separately to measure CRS's self-help skills.

7

conclusion was that CRS's adaptive skills "are within the very poor range[,] functioning with a standard score of 67, indicating a -2.20 SD from the mean."

18.     Finally, there is a dispute between the parties about the meaning of CRS's February 2018 Individual Education Plan. The IEP echoed the Galperin evaluation. In its "Present Levels of Performance" section, the IEP recites that "According to the [DAYC-2], [CRS] currently demonstrates adaptive skills that are within the very poor range; he obtained a standard score of 67." It noted that CRS did not consistently respond to his name and was unable to tolerate having his face or hair washed, and it identified other self-care actions that he could not tolerate or perform. The IEP set goals of manipulating 2–3 buttons with adult assistance over the next 4 months; 4–5 buttons with adult assistance over the next 8 months; and independent manipulation of buttons and use of zippers within 12 months. Plaintiff contends that the IEP reflects a very poor ability to engage in self-care as late as February 2018.

19.     The Commissioner contends, in contrast, that the IEP merely "referenced" the Galperin evaluation from 2016; it did not adopt or validate it. I disagree. That is not how IEPs work. The teachers and other professionals review all available material on the student, combine it with their knowledge of him, and then discuss a proposed plan with the parent. See generally "The IEP," at https://www.schools.nyc.gov/learning/special-education/the-iep-process/the-iep (last visited Mar. 26, 2021). The limitations noted in this IEP were reported as plaintiff's "present" levels of performance. It recites that it was created following a meeting (as is standard operating procedure) between the educators and the parents.

20.     Clearly the most essential part of the IEP process is the assessment of current abilities. A failure at that threshold stage of the process would result in goals that were either unrealistic (because they could not be achieved) or unnecessary (because they had already been

8

achieved). The educators preparing the IEP had to exercise their best judgment in February 2018 to determine what CRS could do at the time they were planning his future so that they could set realistic goals. It would have made no sense to rely on historical, outdated information in setting those goals.

21. I recognize that the ALJ did a thorough, careful analysis on most of the domains that she was required to consider. But in the domain of caring for himself, the ALJ's view of the evidence was selective. "Substantial evidence" does not mean that an ALJ can pull excerpts from the record to support a finding of non-disability when, in fact, the overwhelming weight of the evidence compels a contrary finding. I find the record to be overwhelming here that CRS had a marked limitation in his ability to care for himself.

22. The remaining question is whether this case should be remanded for an additional hearing or, instead, the calculation of benefits. Based on my reason for reversing, I do not see how a rehearing would add anything to the determination of the ALJ as to whether CRS had the functional equivalent of a listed impairment as of the date of the prior hearing. The record is complete, and, again, I view it as overwhelmingly in favor of a finding of disability.

23. Nevertheless, I am going to remand for a rehearing, at the Commissioner's option (instead of calculating benefits), to address one question: whether CRS should have a closed period of disability from birth to some date after the date of the last hearing but prior to this decision, as opposed to an open-ended period of disability. I am allowing that possibility as I recognize that children can badly miss developmental milestones and then accelerate to achieve them over a short period of time. As is typical in these cases, it is going on three years since the ALJ rendered her decision, which can be an extensive period of time in the developmental life of

a child.  If the Commissioner wishes to obtain and review new evidence and reassess whether CRS remains disabled, he may do that.

24. Accordingly, plaintiff's motion for judgment on the pleadings is granted to the extent set forth above, and the Commissioner's motion for judgment on the pleadings is denied. The case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for the Commissioner to either, at his option:  (1) calculate and pay benefits commencing on May 24, 2014 going forward; or (2) calculate and pay benefits for the period May 24, 2014 through December 6, 2018, and conduct a re-hearing, including acquiring evidence created subsequent to December 6, 2018, to determine if CRS ceased to be disabled at any date after December 6, 2018.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated:  Brooklyn, New York
        March 26, 2021